UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GAMERMODZ, LLC,
a Florida limited liability company,

       Plaintiff,

v.                          CASE No. 8:10-CV-1466-T-27TGW

MIKHAIL GOLUBEV, an individual,
GAMINGMODZ. INC., a Florida corp.,
and RAPIDMODZ, INC., a Florida corp.,

       Defendants.

_____

## REPORT AND RECOMMENDATION

       The plaintiff alleges that the defendants' use of "GamingModz"
and "RapidModz" in connection with modified video game controllers
infringes upon its "GAMERMODZ" service mark, which it uses with respect
to the same type of services and products. The defendants have moved for
summary judgment on the plaintiff's claims and their own counterclaims, on
the ground that GAMERMODZ is not entitled to service mark protection.
Additionally, individual defendant Mikhail Golubev argues that the plaintiff

has not presented any evidence to find him personally liable for the conduct alleged in the complaint.

Viewing the evidence in the light most favorable to the plaintiff and granting all reasonable inferences in its favor, there is sufficient evidence from which a jury could find that GAMERMODZ was a valid service mark prior to the start of defendant GamingModz's business in December 2009. This genuine dispute of material fact precludes summary judgment on the plaintiff's claims against defendant GamingModz. On the other hand, the plaintiff failed to make any showing that GAMERMODZ was a protectable mark by February 2009, when RapidModz commenced its business and, therefore, RapidModz is entitled to summary judgment in its favor on the plaintiff's claims against it. Furthermore, the plaintiff has failed to produce evidence from which a jury could reasonably find defendant Mikhail Golubev was an active force in the alleged infringement and, consequently, he is not personally liable for the conduct alleged in the complaint.

Accordingly, I recommend that the defendants' motion for summary judgment be granted to the extent that judgment be entered in favor of RapidModz and Golubev on the plaintiff's claims against them. With

regard to the claims against defendant GamingModz, and the defendants' counterclaims, the motion should be denied.

Additionally, in connection with the motion for summary judgment, the defendants filed a Motion to Strike from consideration two declarations and three exhibits filed in support of the plaintiff's opposition to the summary judgment motion. Because these witnesses and two of the exhibits were belatedly disclosed without adequate justification, I recommend that the Motion to Strike be granted to the extent that the declarations of Coy A. Christmas and Jonah Matthew Coe, and exhibits C and D to Colin Jones's declaration, be stricken from the record.

I.

Plaintiff GamerModz, LLC, is a Florida corporation based in Tampa, Florida, that sells modified video game controllers over the internet at its website operated under the domain name "Gamermodz.com" (Doc. 1, ¶¶1, 8).[1] Consumers may also send their own controllers to the plaintiff for modification, or buy parts from the plaintiff to modify the controllers

---

[1]A domain name is the address for a website, similar to a street address for a home. See Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1044 (9th Cir. 1999).

themselves (Doc. 56-1, pp. 99-100).[2] The modified video game controllers allow individuals to play video games at a faster pace and, therefore, give them an advantage in playing (Doc. 36-17, ¶25; Doc. 56-1, pp. 74-75).[3]

Defendants GamingModz and RapidModz are Florida corporations that also sell modified video game controllers over the internet at www.gamingmodz.com and www.rapidmodz.com, respectively (Doc. 36-17, ¶¶4, 11). Defendant Mikhail Golubev is the registered agent for defendants GamingModz and RapidModz (Doc. 60-1, ¶4).

Colin Jones, the managing member of GamerModz, LLC, began using the GAMERMODZ mark in connection with the sale of modified video game controllers in the Fall of 2007 (Doc. 61-1, ¶9). Jones chose the GAMERMODZ name because, in his view, it conveyed in a unique way that it offers modified equipment for video gamers (Doc. 56-1, pp. 83-84). The plaintiff incorporated GamerModz as a Florida limited liability company in January 2008 (Doc. 36-5, p. 6).

---

[2] All references to the record correspond to the docket and page numbers assigned by CM/ECF.

[3] Modified controllers have been called "controllers on steroids." Some gamers consider their use to be unfair because they tilt the playing field.

On January 6, 2009, GamerModz, LLC, registered the GAMERMODZ mark as a service mark on the Supplemental Register of the U.S. Patent and Trademark Office (PTO) for providing video and computer game controller modification services (Doc. 1-1).[4] The plaintiff initially sought registration in 2008 on the Primary Register, but that request was rejected because the PTO found that the mark was only descriptive of the plaintiff's services (Doc. 21-3).

In 2008 and 2009, GamerModz engaged in substantial promotional efforts, spending in excess of $100,000 on internet advertising (Doc. 61-1, ¶17). GamerModz's business grew from 60 customers and revenues of $8,970.53 in 2007, to 6,380 customers and revenues of $835,482.23 in 2009 (id., ¶30).

Defendant RapidModz registered its domain name, RapidModz.com, and began selling modified video game controllers in

_____

[4]A service mark is statutorily defined as a word, name, or symbol used to identify and distinguish the services of one party from the services of others and to indicate the source of the services, even if that source is unknown. 15 U.S.C. 1127. A trademark is a word, name, or symbol used by a party to identify and distinguish that party's goods from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown. Id. It seems at this point that the plaintiff's primary business is the sale of modified controllers, rather than their servicing, so that "trademark" may be the more appropriate term. Regardless, the plaintiff registered "GamerModz" as a service mark, so that term will be used.

February 2009 (Doc. 36-17, ¶11). RapidModz subsequently incorporated in Florida in December 2009 (id., ¶10).

Defendant GamingModz registered the domain name GamingModz.com in December 2009, and incorporated in Florida in January 2010 (id., ¶¶3, 4). Prior to registration of its domain name, GamingModz visited the plaintiff's website, GamerModz.com, and selected as its web design firm the company that created GamerModz's website (Doc. 60-1, ¶¶17, 44-47).

In April 2010, GamerModz noticed consumers returning to GamerModz products purchased from GamingModz (Doc. 61-1, ¶22). For example, on April 16, 2010, GamerModz received from a consumer a videogame controller that was purchased from GamingModz.com (id., ¶23; Doc. 61-2, pp. 11-15).

Further, Jones noticed that, when he typed GAMERMODZ into Google, an internet search engine, defendants GamingModz and RapidModz were listed in the search results (Doc. 61-1, ¶25). Jones reviewed the source code of the GamingModz website, and discovered that GamingModz inserted Gamermodz as a meta tag in its website (id., ¶27). The meta tag, which is invisible to the consumer, is detected by the search engine and is used to

-6-

compile a list of  websites that are relevant to the consumer's search (id.).
Consequently, when GAMERMODZ is typed into an internet search engine,
GamingModz.com appears as a relevant search result (id., ¶28).

In May 2010, the plaintiff sent to the defendants cease and desist
letters, alleging that the defendants' use of GamingModz and RapidModz in
connection with the sale of modified video game controllers infringed upon
its GAMERMODZ mark (Doc. 1, ¶¶38. 61). The defendants refused to
comply with the plaintiff's demands (see id., ¶39).

Consequently, the plaintiff filed this lawsuit, alleging service
mark infringement and unfair competition under the Lanham Act, 15 U.S.C.
1114. 1125; common law unfair competition; and the violation of the Florida
Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. 501.201, *et
seq.*, (Doc. 1). Specifically, the complaint alleges that GAMERMODZ is a
distinctive mark among purchasers of modified video game controllers, and
the defendants deliberately chose marks that were confusingly similar to
GAMERMODZ in order to benefit from its goodwill and divert customers to
the defendants' websites (see id., pp. 3-4). The defendants filed an answer
which denies the plaintiff's claims, and they assert counterclaims for a

declaratory judgment that their use of GamingModz and RapidModz is lawful (Doc. 21).

As indicated, the defendants have moved for summary judgment on the plaintiff's claims and their own counterclaims (Doc. 35) on the ground that GAMERMODZ is not entitled to service mark protection. Additionally, individual defendant Mikhail Golubev contends that the plaintiff has not presented any evidence that he is personally responsible for the alleged wrongful conduct in the complaint.

The plaintiff has filed a memorandum in opposition to the plaintiff's motion for summary judgment, arguing that GAMERMODZ is a protectable mark because it is a descriptive mark that has acquired secondary meaning (Doc. 57). Further, the plaintiff argues that a jury could reasonably conclude that defendant Mikhail Golubev played an active role in the alleged infringement and, therefore, he is personally liable for the conduct alleged in the complaint.

In support of its position, the plaintiff submitted several exhibits and declarations. The defendants filed a Motion to Strike from the record two of these declarations and three exhibits on the basis that the plaintiff unjustifiably failed to disclose these witnesses and documents in a timely

-8-

manner (Doc. 63).   The defendants also seek to strike the plaintiff's opposition memorandum as untimely (id.).

The Motion for Summary Judgment and the Motion to Strike were referred to me for a report and recommendation (Docs. 45, 63). Subsequently, oral argument was heard on those motions (Doc. 65).

## II.

Rule 56(a), F.R.Civ.P., provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Material facts are those over which disputes "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   Disputes about material facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.  The movant bears the burden of establishing the absence of a dispute over material facts. Reynolds v. Bridgestone/Firestone, Inc., 989 F.2d 465, 469 (11th Cir. 1993).

Where the party opposing the summary judgment motion has the burden of proof at trial, the moving party may discharge its initial burden by identifying specific portions of the record which show the absence of

evidence to prove the nonmoving party's case at trial. United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir. 1991). Alternatively, the movant may come forward with "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." Id. at 1438. If the moving party does not meet its burden, then the motion for summary judgment will be denied. Id. at 1437.

Where the moving party meets its initial burden, the burden then shifts "to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). If the party opposing the motion is unable to make a sufficient showing on an element essential to its case on which it has the burden of proof at trial, the movant is entitled to summary judgment. United States v. Four Parcels of Real Property, supra, 941 F.2d at 1438.

Where the party moving for summary judgment has the burden of proof at trial, it must affirmatively show the absence of a genuine dispute of material fact by presenting credible evidence that would entitle it to a directed verdict if the evidence was not controverted at trial. Id. If the moving party does not meet its burden, then the motion for summary judgment will be denied. Id. at 1437-38. If the movant meets its initial

-10-

burden, then it is entitled to summary judgment unless the nonmoving party comes forward with "significant, probative evidence demonstrating the existence of a triable issue of fact." Id. at 1438.

In determining whether the moving party should be awarded summary judgment, the court must view the evidence and factual inferences therefrom in the light most favorable to the opposing party. Reynolds v. Bridgestone/Firestone, Inc., supra, 989 F.2d at 469. Any reasonable doubts about the facts are to be resolved in favor of the party opposing the motion for summary judgment. Id.

## III.

On the day before oral argument on the Motion for Summary Judgment, the defendants filed a Motion to Strike Plaintiff's Memoranda of Law and Exhibits filed in Opposition to the Defendants' Motion for Summary Judgment (Doc. 63) as untimely. The defendants request the court to strike the declarations of Christmas and Coe, who are managing members of competing companies that sell modified game controllers (Docs. 58-1; 59-1). These witnesses aver in their declarations that GAMERMODZ denotes to them the plaintiff's company (Doc. 58-1, ¶16; Doc. 59-1,¶17). The defendants also seek to strike exhibits A, C, and D to Jones's declaration.

-11-

which consist of the source code of the GamingModz website, and two internet articles that show the GAMERMODZ mark in connection with the promotion of defendant GamingModz's website (Doc. 61-1; Doc. 61-2, pp. 17-18).

The defendants argue that the declarations of Christmas and Coe should be stricken because the plaintiff failed to identify these declarants as potential witnesses during discovery (Doc. 63, p. 4). In fact, defense counsel stated at the hearing that Christmas and Coe were a "complete surprise" to the defendants, as these witnesses were unknown to them until they received the plaintiff's memorandum in opposition to summary judgment on the night of Wednesday, June 22, less than 48 hours before oral argument on the motion, and more than two months after the discovery deadline (Doc. 28). Further, the defendants assert that the plaintiff had not previously produced exhibits A, C, and D to Jones's declaration (Doc. 63, p. 4). At the hearing, plaintiff's counsel did not dispute that Christmas and Coe were first disclosed in the summary judgment opposition memorandum, and stated that he did not know whether he had produced the exhibits to the defendants.

This is yet another example (albeit the most prejudicial to date) in a pattern of dilatory conduct by plaintiff's counsel, Thomas Steele, in the

prosecution of this case. As the defendants outlined in their Motion for Sanctions (Doc. 34, pp. 3-6), the plaintiff has developed a pattern of ignoring local rules, the Federal Civil Rules of Procedure, and case management deadlines.

Thus, the inadequacy of, or failure to respond to, the defendants' discovery requests necessitated the defendants' filing three motions to compel discovery (Docs. 24, 25, 31). Further, not even a court Order compelling discovery (which was granted after the plaintiff failed to oppose the motion) spurred the plaintiff to provide adequate responses to the defendants' First Set of Interrogatories, which had been served upon the plaintiff seven months earlier (Doc. 32). Consequently, the defendants filed a Motion for Sanctions (Doc. 34), which sought dismissal of the complaint based on the plaintiff's failure to comply with the court's discovery and case management Orders. Additionally, the plaintiff itself engaged in only limited discovery; thus, it has not even deposed any of the defendants it alleges egregiously infringed its service mark.

In response to the Motion for Sanctions, Steele acknowledged these deficiencies, stating that he "simply lost control of several cases, including this one" (Doc. 38, p. 4). He attributed the deficiencies to the

resignation of an associate in late December 2010, and to the following health problems: hypothyroidism in the fall of 2010; plantar faciitis (an inflammation of his left foot and ankle) in early 2011; and a slip and fall in April 2011, which resulted in two broken bones in his left hand and damage to his left knee, ankle, and foot (id., pp. 3-6, 10). I afforded plaintiff's counsel consideration on the basis of his medical situation, and only assessed against the plaintiff the defendants' attorney's fees incurred in filing the Motion for Sanctions. However, at the hearing on the Motion for Sanctions, I admonished Steele, a solo practitioner, that if he was not physically able, he needed to obtain the assistance of counsel to prosecute this case.

Nonetheless, Steele did not obtain the assistance of co-counsel, and the delays continued. On May 16, 2011, the defendants filed their motion for summary judgment. The plaintiff requested three extensions of time to file its memorandum in opposition to the defendants' summary judgment motion. The requests (including one so that Steele could enjoy the Father's Day holiday), were unopposed by the defendants, and granted by the court (Docs. 49, 52, 54). The plaintiff, however, then failed to file its opposition memorandum on the thrice-extended deadline of Tuesday, June 21, 2011. Rather, it filed its opposition memorandum with the court, untimely, on

Wednesday, June 22, 2011, at 8:43 p.m. (see Doc. 57), leaving opposing counsel one business day to review the opposition memorandum and prepare her reply for oral argument. The evening prior to oral argument, the plaintiff filed a motion for a fourth extension of time, requesting that its summary judgment opposition memorandum be considered timely (Doc. 62).

At oral argument on the motion for summary judgment, I informed Steele that his health can no longer excuse his failure to comply with court orders and the Federal Rules of Civil Procedure in prosecuting this case, and he candidly agreed. The plaintiff's fourth motion to extend time to file its opposition memorandum was granted as to the legal arguments asserted therein because defense counsel stated that she had adequate time to prepare a response to those arguments.[5] However, the same cannot be said with respect to the plaintiff's untimely disclosure of witnesses and documentary evidence.

At the hearing, Steele stated that he was not relying on his health to excuse his failure to disclose timely the witnesses and documents. Rather, Steele said that Christmas and Coe had not been identified earlier because

---

[5]The granting of this motion moots the defendants' request to strike the plaintiff's opposition memorandum as untimely.

they were not discovered until the previous week. In this regard, Steele represented, vaguely, that he had recently read two cases which stated that the testimony of vendors may be used to establish secondary meaning, thereby prompting him to obtain the testimony of Christmas and Coe. However, as a seasoned litigator with thirty years experience in unfair competition cases, Steele's explanation appears disingenuous or, at best, shows an inexcusable failure to prepare his case in a timely manner.

Federal Rule of Civil Procedure 26(a) requires a party to disclose to the opposing party the names of all individuals "likely to have discoverable information," as well as all documents that the disclosing party has that it "may use to support its claims or defenses." A party also has a duty to supplement its disclosures if the party learns that in some material respect the responses are incomplete. Rule 26(e), F.R.Civ.P. Additionally, Rule 37( c), F.R.Civ.P., provides that, if a party fails to identify a witness or provide information as required by Rule 26, the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial unless the nondisclosing party shows that the failure is substantially justified or is harmless.

In the Eleventh Circuit, three factors are considered in determining whether the testimony of non-disclosed witnesses is properly excluded: "(1) the importance of the testimony: (2) the reason for the [plaintiff's] failure to disclose the witness earlier; and (3) the prejudice to the opposing party if the witness ... [is] allowed to testify." Pete's Towing Co. v. City of Tampa, Fla., 378 Fed. Appx. 917, 920 (11ᵗʰ Cir. 2010)(unpub. dec.)(quoting Bearint ex rel. Bearint v. Dorell Juvenile Group, Inc., 389 F.3d 1339, 1353 (11th Cir.2004)).

The declarations of Christmas and Coe constitute important testimony. Thus, Christmas and Coe, who are competitors of the plaintiff, aver that they associate the service mark GAMERMODZ with the plaintiff's company (Doc. 58-1, ¶16; Doc. 59-1, ¶17). These declarations are critical because they are the plaintiff's only direct evidence that GAMERMODZ has acquired secondary meaning, which the plaintiff must establish for service mark protection. Therefore, this factor favors the plaintiff.

On the other hand, the defendants did not learn of these witnesses until they received the plaintiff's summary judgment opposition memorandum and, therefore, they had no opportunity to depose these witnesses or otherwise investigate their testimony. Consequently,

-17-

consideration of these declarations, sprung on the defendants at the last possible minute, unquestionably would result in prejudice that supports their exclusion. See Pete's Towing Co. v. City of Tampa, Fla., supra, 378 Fed. Appx. at 920 (finding that the defendants, who had filed their summary judgment motion prior to learning of the facts in the affidavits, would have been prejudiced by consideration of those affidavits in opposition to their summary judgment motion).

Since each side has a factor in its favor, the determinative factor is the plaintiff's reason for failing to disclose the witnesses earlier. Id. As indicated, Steele stated that the untimely identification of these witnesses was attributable to his recent discovery of legal authority that the testimony of vendors may be used to establish secondary meaning.[6] Considering that plaintiff's counsel has practiced unfair competition counseling and litigation for almost 30 years, and that service mark infringement and unfair competition are focus areas of his law firm, see www.steelelawgroup.com. this explanation appears to be a disingenuous attempt to obfuscate what is

---

[6]It is unclear why it was not apparent to Steele prior to the discovery of this legal authority that the testimony of competitors is probative, admissible evidence on the issue of secondary meaning.

simply a belated investigation to find evidence to oppose a summary judgment motion.

Regardless, the last-minute discovery of this legal authority is not adequate justification for the untimely disclosure because this research should have been done long ago. As Steele acknowledged at the hearing, whether the plaintiff's mark had acquired secondary meaning was a key issue from the beginning of this case. Thus, the parties identified in their pleadings that secondary meaning was a central issue in this case (see, e.g., Doc. 1, pp. 3, 6; Doc. 21, p. 15), and the plaintiff was informed by the PTO long before suit was filed that it needed to show secondary meaning.

Moreover, the issue of secondary meaning was clearly raised in the defendants' Motion for Summary Judgment. Nonetheless, it was not until a month after receiving the summary judgment motion that Steele allegedly discovered the caselaw which prompted him to contact these witnesses. Significantly, at the hearing plaintiff's counsel offered no reason why this legal authority could not have been discovered in a timely manner.

In sum, this circumstance presents, at best, an inexcusable lack of preparation by plaintiff's counsel. Considering the absence of an adequate justification for the untimely disclosure of these witnesses, and the substantial

prejudice to the defendants if these declarations are considered, I recommend that the Christmas and Coe declarations be stricken from the record.

The defendants also seek exclusion of exhibits A, C, and D to Jones's declaration on the ground that these documents were not produced to them during discovery (Doc. 63). Exhibit A is a source code from defendant GamingModz's website which shows "Gamermodz" as a meta tag (Doc. 61-1, p. 11). Exhibits C and D are internet articles titled "Acquire The Innovative Methods of Gamermodz" and "Get The Newest Features Of Gamermodz" (Doc. 61-2. pp. 17-18).[7] These articles mention "Gamermodz" in connection with the promotion of defendant GamingModz's website.

Applying the Pete's Towing three-factor test, the importance of the evidence favors the plaintiff. Thus, the three exhibits indicate that defendant GamingModz copied the GAMERMODZ mark to promote the GamingModz website, and such copying is relevant to determining secondary meaning. The second factor favors exclusion of the exhibits because plaintiff's counsel offered no explanation why this documentation was not

---

[7]It is noted that the plaintiff refers in his memorandum to the articles as exhibits C and D; however, the articles are appended to the memorandum together as exhibit C.

timely disclosed (in fact, he does not even know if it was produced). Therefore, exclusion of these exhibits turns on whether the defendants would be prejudiced by their consideration.

Plaintiff's counsel argued that these exhibits are purportedly in the defendants' records and, therefore, should not be excluded in accordance with Munnings v. FedEx Ground Package Systems, Inc., 2008 WL 1849003 (M.D. Fla. 2008)(unpub. dec.). In Munnings, then-Chief Judge Fawsett found that no prejudice would result from consideration of untimely disclosed statements that the "Defendant concede[d] ... [we]re from its own records." 2008 WL 1849003 at *8. Thus, the Munnings court explained that the defendant would not suffer prejudice because it had access to these statements in its records, and the defendant had even presented rebuttal evidence. Id.[8]

The plaintiff argues that exhibits A, C, and D to Jones's declaration likewise should not be excluded because they are from the defendants' records. Exhibit A, the source code for defendant GamingModz's website, is documentation that would reasonably be within its possession, custody or control, as GamingModz is responsible for the

---

[8]This ruling was not dependent upon the defendant's production of the records to the plaintiff in discovery.

contents of its website. Furthermore, the plaintiff told the defendants during discovery that GamingModz's website source code improperly contained the plaintiff's mark (Doc. 56-1, p. 42; Doc. 56-4, p. 7).[9] Therefore, the defendants had ample opportunity to rebut this contention.

Moreover, Jones's declaration is a separate source of this evidence, as he states in his declaration that he examined the source code of the GamingModz website in May 2010, and that it showed "Gamermodz" as a meta tag in the content of the website (Doc. 61-1, ¶27). Consequently, under these circumstances, it is appropriate to conclude that consideration of the website source code is not unduly prejudicial to the defendants. <u>See</u> <u>Munnings</u> v. <u>FedEx Ground Package Systems, Inc.</u>, <u>supra</u>. Accordingly, I recommend that the motion to strike exhibit A be denied.

On the other hand, the plaintiff has failed to show that the rationale in <u>Munnings</u> applies to exhibits C and D to Jones's declaration. Thus, exhibits C and D are internet articles posted at <u>www.selectivearticles.com</u>, a "Rentaccommspain.com" company, and

---

[9]Also, the plaintiff stated in a discovery response that the documents setting forth the use of GamerModz in the metadata were produced as Bates-labeled GAMR0001-0460; GAMR0483-1581 (Doc. 56-4, p. 7). However, the defendants stated at the hearing that the source code was not produced.

www.india-articles.com, which is copyrighted by Chandel Technologies Pvt. Ltd. (Doc. 61-2, pp. 17, 18). There is no known connection between the defendants and these third-party websites, and the defendants do not acknowledge publication or possession of these articles. Thus, there is no basis to conclude that these articles are part of the defendants' records. Further, GamingModz would be prejudiced by the court's consideration of these internet articles because it did not have an adequate opportunity to evaluate them. Since two of the three factors favor exclusion of these exhibits, I recommend that exhibits C and D to Jones's declaration be stricken.

In summary, I recommend that the defendants' Motion to Strike be granted to the extent that the court strike from the record the declarations of Christmas and Coe, and the internet articles, which are identified by the plaintiff as exhibits C and D to Jones's declaration.[10]

---

[10]The plaintiff also argued in the Motion to Strike that portions of Jones's declaration should be stricken or disregarded because it contains legal conclusions and speculation, and contradict his deposition testimony (Doc. 63, pp. 1-2, 5). I have disregarded those portions of Jones's declaration which consist of inadmissible testimony, and the defendants failed to identify in their motion or during oral argument meaningful instances of inconsistent testimony.

III.

A. The plaintiff claims in its lawsuit, among other things, that the defendants have committed service mark infringement, in violation of the Lanham Act, 15 U.S.C. 1114. A plaintiff seeking to prevail on a service mark infringement claim must prove that its service mark is entitled to protection, and that the defendants used a similar or identical mark that was likely to confuse consumers. St. Luke's Cataract and Laser Institute, P.A. v. Sanderson, 573 F.3d 1186, 1207 (11th Cir. 2009).

The sole issue presented by the corporate defendants on this motion for summary judgment is whether the plaintiff has shown that GAMERMODZ is entitled to service mark protection (Doc. 35, p. 4). To prove a protectable interest, the plaintiff must establish that it used the mark before the defendants, and that the mark is either inherently distinctive or acquired a secondary meaning prior to the date that the defendants commenced using the mark. See Investacorp, Inc. v. Arabian Inv. Banking Corp., 931 F.2d 1519, 1524 (11th Cir. 1991), cert. denied, 502 U.S. 1005 (1991). The defendants do not dispute that the plaintiff used the GAMERMODZ mark before they began using GamingModz and RapidModz.

-24-

Rather, the defendants argue that the mark is not inherently distinctive, and has not acquired secondary meaning (Doc. 35, p. 4).

Distinctive marks "serve the purpose of identifying the source of the goods or services." <u>St. Luke's Cataract and Laser Institute, P.A.</u> v. <u>Sanderson</u>, <u>supra</u>, 573 F.3d at 1207. The four categories of distinctiveness in service mark law, listed in ascending order, are: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary. <u>Id</u>. at 1208. As explained by the Eleventh Circuit:

> The categories are based on the relationship between the name and the service or good it describes. Generic marks are the weakest and not entitled to protection – they refer to a class of which an individual service is a member (e.g., "liquor store" used in connection with the sale of liquor). Descriptive marks describe a characteristic or quality of an article or service (e.g., "vision center" denoting a place where glasses are sold). "Suggestive terms suggest characteristics of the goods and services and require an effort of the imagination by the consumer in order to be understood as descriptive." For instance, "penguin" would be suggestive of refrigerators. An arbitrary mark is a word or phrase that bears no relationship to the product (e.g., "Sun Bank" is arbitrary when applied to banking services). Arbitrary marks are the strongest of the four categories.

Frehling Enterprises, Inc. v. International Select Group, Inc., 192 F.3d 1330, 1335-36 (11th Cir. 1999), cert. denied, 530 U.S. 1214 (2000)(citations omitted). Only arbitrary and suggestive marks are inherently distinctive. Investacorp, Inc. v. Arabian Inv. Banking Corp., supra, 931 F.2d at 1523. A descriptive mark can become distinctive if it acquires a secondary meaning, whereas a generic mark is not entitled to federal trademark protection because it lacks distinctiveness. Id. at 1522. It has been acknowledged that, while these four categories were meant to be mutually exclusive, they represent bands on a spectrum and that at their edges they are difficult to apply. American Television and Communications Corp. v. American Communications and Television, Inc., 810 F.2d 1546, 1548 (11th Cir. 1987).

The defendants argue that GAMERMODZ is a generic term for the plaintiff's products and services or, at best, is a descriptive word that lacks secondary meaning and, therefore, GAMERMODZ is not entitled to service mark protection (Doc. 35, pp. 18-19). The plaintiff contends that GAMERMODZ is a valid mark because it is a descriptive mark that has acquired secondary meaning (Doc. 57-1, p. 10).[11]

---

[11]At the close of the hearing, plaintiff's counsel asserted that the mark is arbitrary. However, any such contention on summary judgment is clearly untimely. Thus, from the outset of this litigation, the plaintiff contended that GAMERMODZ was a descriptive mark

Clearly, on the spectrum of distinctiveness, a jury could reasonably find that GAMERMODZ "identifies a characteristic ... of [the plaintiff's] service" and, therefore, is descriptive. St. Luke's Cataract and Laser Institute, P.A. v. Sanderson, supra, 573 F.3d at 1208. Thus, based on the definitions of "gamer," who is "a person who plays games," and mod. which refers to "enhancements made ... to ... computer systems" (Doc. 21-3), GAMERMODZ is descriptive of the plaintiff's video game controller modification services. See Investacorp, Inc. v. Arabian Inv. Banking Corp., supra, 931 F.2d at 1523-24.

The PTO's determination that "the mark is ... descriptive" strongly supports this finding (Doc. 21-3, p. 3). Thus, the PTO's conclusion on whether a mark is descriptive is an important factor to consider in light of the PTO's specialized expertise. See The Murphy Door Bed Co., Inc. v. Interior Sleep Systems, Inc., 874 F.2d 95, 101 (2nd Cir. 1989). In this case, the PTO concluded that GAMERMODZ is descriptive because it "[m]erely

that acquired secondary meaning (see Doc. 1, ¶21), and it maintained this position in its summary judgment opposition memorandum (see Doc. 57-1, p. 10). Therefore, the defendants have not had an opportunity to respond to the belated contention that the mark is inherently distinctive. Regardless, GAMERMODZ is not an arbitrary term, because it plainly evokes a relationship to the plaintiff's products and services. See The Vision Center v. Opticks, Inc., 596 F.2d 111, 116 (5th Cir. 1979). cert. denied, 444 U.S. 1016 (1980).

describes the intended user of the proposed services[:] ... computer game controller modification services ... used by gamers" (Doc. 21-3. p. 3).[12]

The defendants' contention that GAMERMODZ is generic is unpersuasive. Simply put, a generic term is "the name of the product or service itself." J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition §12:1, p. 12-4 (4th ed. 2003); see also Welding Services, Inc. v. Forman, 509 F.3d 1351, 1358 (11th Cir. 2007). Since the plaintiff's product or service involves a modified game controller, GAMERMODZ clearly does not fit within the generic category. In fact, GAMERMODZ does not even identify what the plaintiff sells or services because "mod" in this context may refer to modified game consoles, software, or game controllers (Doc. 56-1,

---

[12]The defendants attempt to minimize the significance of the PTO's conclusion, arguing that the PTO did not "cite any of the evidence of third party uses of gamermod or gamermods, or the book ['Build Your Own High-Performance Gamer's Mod PC']" and, therefore, "the PTO examiner had no evidence that the proposed mark was generic" (Doc. 35, pp. 19-20). However, the PTO did consider third party usage of the words comprising GAMERMODZ (see Doc. 21-3, pp. 11, 15, 17), including the book cited by the defendants, "Build Your Own High-Performance Gamer's Mod PC" (Doc. 21-3, pp. 14, 18). Furthermore, although the PTO did not cite to the defunct websites "GAMERMODS.COM" and "GamerMod.com" (Docs. 36-6, 36-7, 36-8), these examples of prior similar third party usage do not prove a mark is generic. See, e.g., Investacorp, Inc. v. Arabian Inv. Banking Corp., supra, 931 F.2d at 1523 (finding Investacorp is a descriptive mark even though a handful of businesses use a combination of the formatives "invest" and "corp").

pp. 29-30).   In all events, GAMERMODZ falls squarely within the descriptive category and is therefore not generic.

B. As indicated, if a mark is descriptive, that does not mean that the mark is entitled to service mark protection.  Investacorp, Inc. v. Arabian Inv. Banking Corp., supra, 931 F.2d at 1522.  A descriptive mark receives federal protection only if it has acquired a secondary meaning in the minds of the relevant consumers.  Id.; 15 U.S.C. 1052(f).[13]

A name has acquired secondary meaning when "the primary significance of the term in the minds of the consuming public is not the product but the producer." Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 118 (1938); St. Luke's Cataract and Laser Institute, P.A. v. Sanderson, supra, 573 F.3d at 1208-09.  Further, the senior user must prove the existence of secondary meaning by the time the junior user began use of the allegedly infringing mark.  Gift of Learning Foundation, Inc. v. TGC, Inc., 329 F.3d 792, 800 (11th Cir. 2003).  The defendants argue that the plaintiff cannot show that GAMERMODZ acquired secondary meaning prior to the time the

---

[13]Registration of the plaintiff's mark on the supplemental register does not affect this analysis.  15 U.S.C. 1095 ("Registration of a mark on the supplemental register shall not constitute an admission that the mark has not acquired distinctiveness.").

defendants began doing business, which was February 15, 2009, for RapidModz, and December 16, 2009, for GamingModz (Doc. 35, p. 22).

In evaluating a claim of secondary meaning, consumer surveys are recognized as the most direct and persuasive evidence of secondary meaning. See, e.g., The Vision Center v. Opticks, Inc., supra, 596 F.2d at 119. The plaintiff did not present any consumer surveys.

In the absence of consumer survey evidence, four other factors are considered in determining whether a particular mark has acquired a secondary meaning: (1) the length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made by the plaintiff to promote a conscious connection in the public's mind between the name and the plaintiff's business; and (4) the extent to which the public actually identifies the name with the plaintiff. See St. Luke's Cataract and Laser Institute, P.A. v. Sanderson, supra, 573 F.3d at 1209. Additionally, instances of customer confusion, and intentional copying of the mark by the defendant, are relevant to a determination of secondary meaning. Caliber Automotive Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC, 605 F.3d 931, 939 n. 36 (11th Cir. 2010); Brooks Shoe Mfg. Co., Inc. v. Suave Shoe Corp., 716 F.2d 854, 860 (11th Cir. 1983).

At the hearing, counsel for the plaintiff was pressed to identify the evidence, aside from that which should be stricken, that he relies upon to show secondary meaning. He specified the following: (1) the plaintiff's continuous and exclusive use of GAMERMODZ since the fall of 2007, in connection with its internet sales of modified game controllers; (2) advertising expenditures to promote GAMERMODZ during 2008 and 2009 totaling more than $100,000; (3) nearly two million viewings of the plaintiff's advertisements on the internet, and more than 200,000 visits to its website at GamerModz.com during the period from December 2008 to November 2009; (4) customer confusion between GamerModz and GamingModz; and (5) copying of the GamerModz mark by defendant GamingModz (see also Doc. 57; Doc. 61-1, ¶¶9, 14-18, 22-30).[14] Viewing this evidence in the light most favorable to the plaintiff, and granting all reasonable inferences in its favor, this evidence is sufficient to create a genuine dispute of material fact whether GAMERMODZ had acquired secondary meaning prior to GamingModz's commencement of business in December 2009. See St. Luke's Cataract and

---

[14]The plaintiff also mentioned that they would periodically send e-mails to prospective purchasers (see Doc. 61-1, ¶31).

Laser Institute, P.A. v. Sanderson, supra. 573 F.3d at 1209 ("The existence of a secondary meaning is a question of fact.").

The plaintiff's advertising expenditures in excess of $100,000 is relevant to establishing secondary meaning because substantial marketing efforts may increase "recognition by the public that the name designates the proprietor's product or service." See id. The plaintiff's primary method of advertising has been Google AdWords, which is a type of marketing where a company pays to have its advertisements appear prominently on search result lists generated through Google, an internet search engine, and certain third party content websites (Doc. 56-1, pp. 13-14). See J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition §25:70.25, p. 25-204.4 (4th ed. 2003).

When computer users enter keywords for a product or service into Google, they receive a list of search results related to those keywords. See Brookfield Communications v. West Coast Entertainment Corp., 174 F.3d 1036, 1045 (9th Cir. 1999). The search results list is comprised of advertisements (also known as impressions), each of which include a link to an entity's website, so if the computer user "clicks" with his mouse on the

advertisement, he is taken directly to the entity's website (Doc. 56-1, pp. 15, 18, 102).

In order to have their advertisements appear prominently in the search results list, companies place "bids" on keywords, and the company with the highest bid has its advertisement displayed first in the search results list when a computer user types those keywords into Google (id., pp. 14, 17). Lower bids are ranked accordingly, and non-paid advertisements appear below the paid advertisements (see id., pp. 34. 127).[15]

Jones states that a high ranking, i.e., high placement on the search results list, is an internet company's "bread and butter" because it helps get relevant consumers to your website (id., p. 52). Thus, Jones opines that a consumer is more likely to click on the first advertisement in the search results list (see Doc. 56-2, p. 33).[16] Jones added that his competitors also market themselves through Google AdWords (Doc. 56-1. pp. 54-55).

---

[15] For example, if the plaintiff has the winning bid on the keywords "XBOX 360 controllers," the plaintiff's advertisement would appear first on the search results list when a computer user types those keywords into Google. The plaintiff only pays the bid amount if the computer user clicks on the advertisement (Doc. 56-1. p. 129).

[16] In this connection. McCarthy notes that many users believe that search engines list the results in the order of relative importance to the keywords entered. McCarthy on Trademarks and Unfair Competition, §25:70.25, p. 25-204.4 (4th ed. 2003).

Between December 29, 2008, and November 30, 2009, the plaintiff bid on almost 300 keywords related to its products (see Doc. 36-14). The plaintiff states that this advertising resulted in nearly two million viewings of the GAMERMODZ mark, and over 200,000 separate visits to the plaintiff's website operated under the domain name "GamerModz.com" (Doc. 61-1, ¶18). More precisely, Jones states that Google AdWords brought "269,972 people to the Gamermodz website wh[o] saw the ad with Gamermodz in it, clicked the ad, came to the site, saw the logos and everything" (Doc. 56-2, p. 37; see Doc. 36-14).[17] Further, the plaintiff saw its sales revenues grow from $8,970.53 in 2007, to $835,482.23 in 2009 (Doc. 61-1, ¶¶18, 30).

The defendants attempt to minimize the significance of these promotional efforts, arguing that the plaintiff cannot corrolate its advertising expenses to the GAMERMODZ mark because the cost of Google AdWords is attributable primarily to keywords which do not include the term GAMERMODZ (Doc. 35, p. 12). This contention is unpersuasive because

---

[17]Thus, the Google monthly advertising expense reports indicate that, during the period from December 29, 2008, through November 30, 2009, there were 269,972 "clicks" on the plaintiff's advertisement (see Doc. 36-14). Since each "click" connotes an individual who was brought to the plaintiff's website (see Doc. 56-1, pp. 102-03), this figure shows that there were 269,972 visits to the plaintiff's website.

the Google AdWords marketing resulted in more than 200,000 visits to the website, where consumers were exposed to the GAMERMODZ mark in connection with the plaintiff's products and services (see Doc. 56-2. p. 37). As a result of the widespread exposure to the mark on the plaintiff's website. it may reasonably be inferred that relevant consumers have come to associate GAMERMODZ with the plaintiff. See J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, §15:30, p. 15-50 (4th ed. 2003) ("evidence showing wide exposure of the buyer class to the mark" is relevant to proving secondary meaning); Restatement of Unfair Competition. Third, §13. comment e. p. 110 ("Advertising and other promotional efforts resulting in increased public exposure for the designation may also support an inference of secondary meaning."). Therefore, the plaintiff's Google AdWords marketing efforts constitute relevant evidence of secondary meaning.

The defendants argue further that the Google advertisements that appear in the search results list do not constitute "true advertising" because they do not contain the name GAMERMODZ (Doc. 35, p. 23). This argument is unpersuasive because the domain name of the plaintiff's website. "gamermodz.com" appears in the advertisements, thereby exposing

consumers to GAMERMODZ in connection with the plaintiff's products and services (see Doc. 56-2, p. 40). See Brookfield Communications, Inc. v. West Coast Entertainment Corp., supra, 174 F.3d at 1045 ("Web users often assume, as a rule of thumb, that the domain name of a particular company will be the company name followed by ".com"); Panavision Int'l, L.P. v. Toeppen, 141 F.3d 1316, 1327 (9th Cir. 1998)("We reject [the] premise that a domain name is nothing more than an address. A significant purpose of a domain name is to identify the entity that owns the web site.").

The defendants assert that the domain name in the advertisement is insignificant because "[p]laintiff's use of its domain name as an indicator of the location of its website on the Internet is not a trademark use" (Doc. 35, p. 23). However, that argument is beside the point because the issue here is whether the plaintiff has shown secondary meaning, not whether there is a trademark use. Furthermore, the advertisement is not merely an indicator of the website's location, but connects the domain name with the products offered on the website.

Nevertheless, the two million viewings of the advertisement are not entitled to substantial weight. The advertisements alone are of limited probative value on the issue of secondary meaning because it is unknown

how many consumers actually read them (see Doc. 56-1. p. 24). Since the plaintiff's advertisement is just one of many in a search results list, the consumer may just scroll through the list without even glancing at some of the advertisements. Therefore, the two million times the plaintiff's advertisement was shown does not reflect the breadth or depth of the public's exposure to the mark.

On the other hand, the plaintiff's evidence of well over 200,000 visits to the website does show substantial exposure of the GAMERMODZ mark to relevant consumers. The defendants argue, unmeritoriously. that these visits to the website are not evidence of secondary meaning because there is no way to know how these individuals got to the website (e.g.. whether the person clicked on an advertisement or typed in the domain name).[18] In this regard, the defendants argue that the number of visits to the website are not connected to the plaintiff's mark unless the person typed GAMERMODZ to get to the website.

---

[18]The defendants also note that a person will also be brought to the GamerModz website if he types one of approximately fifty other domain names owned by the plaintiff which automatically redirect the consumer to the GamerModz website (see Doc. 36-11). For example, a person who types "XBOXMODKITS.COM" will be taken to GamerModz website (see id.).

The defendants, however, do not cite any legal authority to support this contention. Furthermore, it is unpersuasive because, regardless of how the consumers arrive at the website, once at the website the consumers are exposed to the GAMERMODZ mark in connection with the plaintiff's products and service. Therefore, it can reasonably be inferred from this widespread exposure to the website that consumers associate GAMERMODZ with the plaintiff's company.

The defendants also argued at the hearing that the plaintiff's evidence of more than 200,000 visits to the plaintiff's website is exaggerated because the number of "hits" on the plaintiff's website includes irrelevant search engine "robots" who come to the website to gather information for internet search engines. However, this argument is inapposite because the plaintiff's evidence of "over 200,000 separate visits to its website" (Doc. 61-1, ¶19), reflects visitors who came to the website. As Jones discussed in his deposition, "hits" are the number of times someone, or something, comes to your website (Doc. 56-1, pp. 18-19). Search engine robots are counted as hits (id.). Visitors are distinct from hits (id., p. 19). Visitors are people who come to the website (id.).

In this case, the plaintiff's evidence of more than 200,000 visits to the website pertains to people visiting the website, and not robots. This is shown by the Google data which reflects 269,972 clicks (Doc. 36-14). Thus, "clicks" reflect the number of visitors who come to a website by clicking on an advertisement with a computer mouse (Doc. 56-1, pp. 102-03, 125). Therefore, the stated number of visits to the plaintiff's website is not reduced due to search engine robots.

In sum, the plaintiff's substantial advertising expenses have resulted in widespread exposure of the GAMERMODZ mark in relation to the plaintiff's company. This is relevant evidence of secondary meaning.

Also supporting the plaintiff's contention that its mark had developed secondary meaning is evidence of customer confusion. Instances of consumer confusion are probative of secondary meaning because they tend to show that the relevant purchasing public associates the product with the plaintiff.   Caliber Automotive Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC, supra, 605 F.3d at 939 n. 36; J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, §15:11, p. 15-26.2  (4th ed. 2003). In other words, "[i]f a trade name has not acquired secondary meaning, the purchaser will not make an association with a particular producer and thus

will not be misled by an identical or similar mark." Perini Corp. v. Perini Const., Inc., 915 F.2d 121, 125 (4th Cir. 1990).

In this regard, Jones testified that, beginning in April 2010, consumers sought from it refunds, repairs or inspection of items purchased from defendant GamingModz (Doc. 61-1, ¶22). In particular, the plaintiff presents a copy of an e-mail exchange between GamerModz's customer service representative and a consumer who mistakenly returned to GamerModz a modified game controller it purchased from GamingModz (Doc. 61-2, pp. 11-14). This evidence is probative of secondary meaning because it tends to show that the consuming public associates GAMERMODZ with a particular company that sells or services modified game controllers, and not just with a category of products. See Caliber Automotive Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC, supra.

It is recognized that this incident of confusion occurred about five months after GamingModz registered its domain name. The customer confusion would have been strong evidence that GAMERMODZ had acquired secondary meaning if it had happened before defendant GamingModz began using its mark. Since it did not, the probative effect on the issue of secondary meaning is significantly diminished. Nevertheless, the

-40-

incident clearly supports a conclusion that by April 2010 "GAMERMODZ" had acquired secondary meaning and, consequently, it reasonably permits an inference, absent any indication to the contrary, that by December 2009 secondary meaning had developed. The circumstance of actual confusion, therefore, provides additional support for the plaintiff's contention that there is at least a genuine dispute of fact whether the GAMERMODZ mark had acquired secondary meaning before the use of the GamingModz mark.

Finally, the plaintiff presented evidence that defendant GamingModz copied the GAMERMODZ mark in promoting its website (Doc. 61-1, ¶27). "[P]roof of intentional copying is probative evidence on the secondary meaning issue." Brooks Shoe Manufacturing Co. v. Suave Shoe Corp., supra, 716 F.2d at 860. Thus, it suggests that the defendant perceives the plaintiff's mark to be established in the market, and that the defendant is seeking to benefit from that association. See M. Kramer Mfg. Co., Inc. v. Andrews, 783 F.2d 421, 449 (4th Cir. 1986).

In this regard, the plaintiff presented evidence that defendant GamingModz copied "Gamermodz" as a meta tag in GamingModz's website source code (Doc. 61-1, ¶27). Meta tags are words or phrases that are embedded within the website's computer code that are intended to describe

-41-

the contents of a website. North American Medical Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1217 n.2 (11th Cir. 2008). Although websites do not display meta tags to consumers, internet search engines utilize meta tags, and other sources, to find websites that are relevant to a consumer's search. Id. (Doc. 56-1, pp. 21-22). The plaintiff claims that, as a result, when an internet user types GAMERMODZ into an internet search engine, defendant GamingModz's domain name appears in the search results list (Doc. 61-1, ¶¶27, 28).

The plaintiff argues that there is no legitimate justification for the defendant's copying of "Gamermodz"– exactly as the plaintiff spells it– except to capitalize on the mark (see id.). Granting all reasonable inferences in the plaintiff's favor, it can be inferred that the defendant copied the mark because GamingModz had recognized GAMERMODZ had acquired distinctiveness and was attempting to benefit from it. See M. Kramer Mfg. Co., Inc. v. Andrews, supra. Therefore, this copying is probative evidence of secondary meaning.

In sum, viewing the evidence in the light most favorable to the plaintiff, and taking all reasonable inferences in its favor, there is a genuine dispute of material fact regarding whether GAMERMODZ had acquired

secondary meaning among the relevant video gaming community by December 16, 2009, when GamingModz commenced its business. Accordingly, GamingModz is not entitled to summary judgment on its contention that GamerModz did not have, at the pertinent time, a protectable federal service mark, which was the sole challenge it raised against the plaintiff's Lanham Act claim. Furthermore, because the plaintiff's claims of unfair competition and violations of the FDUTPA are analyzed in the same manner as the federal service mark claim, see Gift of Learning Foundation, Inc. v. TGC, Inc., supra, 329 F.3d at 802, genuine issues of material fact preclude summary judgment in GamingModz's favor on those claims as well.

     C. On the other hand, the plaintiff has failed to proffer sufficient evidence from which a jury could reasonably conclude that GAMERMODZ had acquired secondary meaning by the time defendant RapidModz commenced its business on February 15, 2009. See id., p. 800 (the senior user must prove the existence of secondary meaning by the time the junior user began use of the allegedly infringing mark).

     The defendants pointed out in their motion for summary judgment that defendant RapidModz commenced its business on February 15, 2009, and argued that the plaintiff had no evidence that GAMERMODZ had acquired

secondary meaning by that date (Doc. 35, pp. 10, 22; Doc. 36-17, ¶11). Consequently, the burden shifted to the plaintiff "to demonstrate that there is indeed a material issue of fact" as to whether GAMERMODZ had acquired secondary meaning by February 15, 2009. Clark v. Coats & Clark, Inc., supra, 929 F.2d at 608.

However, not only does the plaintiff fail to respond to this contention, it essentially ignores RapidModz in its opposition memorandum. Thus, in the memorandum's list of wrongful acts upon which the claims for relief are based, the RapidModz mark is not even mentioned (Doc. 57, p. 4). Further, in its list of facts, the plaintiff does not acknowledge when RapidModz began its business (see Doc. 57-1, p. 2).[19] Significantly, in the conclusion section of its opposition memorandum, the plaintiff asserted that the pertinent question for the jury was whether the plaintiff's mark "had acquired 'secondary meaning' when the Corporate Defendant GamingModz

---

[19]RapidModz was incorporated in December 2009, which was several months after it commenced business (Doc. 36-17, ¶¶10, 11). The plaintiff does not argue that RapidModz's date of incorporation is the date by which it must establish secondary meaning to pursue its claims against RapidModz. Further, that position is not supported by the law. See Investacorp, Inc. v. Arabian Inv. Banking Corp., supra, 931 F.2d at 1524 (discussing that the plaintiff's mark must have attained secondary meaning before the date that the defendant "used" the similar term). Moreover, such an argument would be anomalous since the plaintiff itself relies on its first use of GAMERMODZ in September 2007 (not its December 2008 date of incorporation), to establish secondary meaning for GAMERMODZ.

-44-

began to misuse it and infringe it" (id., p. 10). Thus, the plaintiff does not mention the acquisition of secondary meaning by the time RapidModz began its business in February 2009. This failure to acknowledge this essential element of its claims against RapidModz constitutes an abandonment of the contention that the mark had acquired secondary meaning prior to RapidModz's use.

In any event, the plaintiff's failure to present evidence showing that GAMERMODZ had acquired secondary meaning by the time RapidModz began doing business in February 2009 warrants summary judgment in RapidModz's favor. Thus, Jones identifies the "relevant period" for the acquisition of secondary meaning as "the Fall of 2007 through November 2009," and presents evidence of advertising expenditures and public exposure to the mark for that time period (Doc. 61-1, ¶¶11, 17, 18).[20] Additionally, the plaintiff presents evidence of revenues and prospective purchasers as of December 2009 (see id., ¶¶30, 31). Thus, the plaintiff fails to delineate evidence showing secondary meaning by February 2009. Moreover, the evidence of customer confusion and copying pertain only to defendant

---

[20]Tellingly, Jones himself opines the GAMERMODZ mark acquired secondary meaning "[b]y late 2009" (Doc. 61-1, ¶19).

GamingModz (see id., ¶¶22-24, 27-29).[21] Therefore, the only remaining factor in the plaintiff's opposition memorandum that is pertinent to the establishment of secondary meaning by February 2009 is the plaintiff's continuous and exclusive use of the mark since Fall 2007. However, mere use of the mark is insufficient to show it acquired distinctiveness. See The Vision Center v. Opticks, Inc., supra, 596 F.2d at 119.

This lack of proof was raised again by defense counsel at the hearing on this motion. However, plaintiff's counsel merely responded that he had nothing to say about RapidModz other than what was in the opposition memorandum, which, as just discussed, was also nothing. Since the plaintiff clearly has not presented sufficient evidence from which a jury could reasonably find that GAMERMODZ had acquired secondary meaning by the time RapidModz began its business in February 2009, summary judgment should be granted in favor of RapidModz on the plaintiff's claims against it.[22]

---

[21]Jones only speculates in his declaration that RapidModz copied the GamerModz mark (see Doc. 61-1, ¶25). Thus, unlike GamingModz, Jones did not attest in his declaration that he reviewed RapidModz's source code to determine that RapidModz copied the GAMERMODZ mark (see id., ¶27).

[22]The defendants make the conclusory assertion in a footnote that, if the plaintiff cannot establish secondary meaning by February 2009, that "the inquiry [with regard to defendant GamingModz] is over as a practical matter, since it would not be logical to suggest that such secondary meaning attached during the 10 months that both Plaintiff and

V.

In addition, Mikhail Golubev seeks summary judgment on the plaintiff's claims of personal liability on the ground that he has not participated in any activities of either corporation that would make him personally liable for the misconduct alleged in the complaint.

It is well-established that individuals may be liable for trademark or service mark infringement under the Lanham Act. See Chanel, Inc. v. Italian Activewear of Florida, Inc., 931 F.2d 1472, 1477 (11th Cir. 1991); Mead Johnson & Co. v. Baby's Formula Service, Inc., 402 F.2d 19, 23 (5th Cir. 1968). Personal liability attaches "[i]f an individual actively and knowingly caused the infringement" such that he was a "moving, active, conscious force." Chanel, Inc. v. Italian Activewear of Florida, Inc., supra, 931 F.2d at 1477-78 (citations omitted). Thus, the "individual liability standard does not ask whether the individual participated or engaged in some

---

... Rapidmodz were using the same term" (Doc. 35, p. 22 n.4). This contention should be rejected because it is not factually developed or supported by legal authority. Furthermore, it is inapt because, among other things, the court is not concluding that secondary meaning did not exist by February 2009, only that the plaintiff failed to present evidence with regard to this time period. Moreover, as discussed above, the plaintiff has presented sufficient evidence from which a jury could reasonably find that GAMERMODZ had secondary meaning by December 2009.

infringing act; instead, it asks whether he actively participated as a moving force in the decision to engage in the infringing acts, or otherwise caused the infringement as a whole to occur." Id. at 1478 n. 8.

Mikhail Golubev has presented uncontroverted evidence that he was not a moving, active or conscious force in the decisions to engage in the purportedly infringing conduct. Thus, Mikhail Golubev and his son Alex Golubev attest that Mikhail Golubev (1) had "no role" in the choice of either corporate defendant's name, (2)  did not register either domain name, (3) "never ... had any role" in selecting the text or images that appear on either website, and (4) "never ... had any role" in the advertising or marketing decisions (Doc. 36-16, ¶¶6-10, 13-16; Doc. 36-17, ¶¶4-9, 11-15). Further, it is Alex Golubev, not Mikhail Golubev, who operates the defendant companies (Doc. 36-17, ¶2; Doc. 60-1, ¶¶3, 9).

The plaintiff has failed to respond with evidence sufficient to create a genuine dispute of material fact as to Mikhail Golubev's personal liability for the claims alleged in the complaint. In fact, other than being the registered agent for the corporate defendants, Mikhail Golubev's role in the corporations is undefined, likely because the plaintiff did not depose any of the defendants.

Rather, the only circumstances the plaintiff offers in support of Golubev's individual liability is that Mikhail Golubev allegedly visited the plaintiff's website in late 2009, and he gave or loaned money to the defendant corporations (Doc. 57-1, pp. 8-9; Doc. 60-1, ¶¶17, 70, 71). However, a financial investment in a company does not, in itself, render an individual personally liable for infringement because merely investing in a company does not show that the individual even knows of any infringing conduct, much less show that the person was a "moving, active, conscious force" in the decision to engage in infringing acts. Coach Services, Inc. v. 777 Lucky Accessories, Inc., 2010 WL 2266023 at *4 (S.D. Fla. 2010)(merely "passive investors" who "do not actively manage" the affairs of the corporate defendant are not personally liable for trademark infringement). The plaintiff, furthermore, has not presented any legal authority to the contrary.

The only other evidence offered by the plaintiff in support of personal liability is Jones's declaration that Mikhail Golubev visited the plaintiff's website in late 2009, before defendant GamingModz began doing business, ostensibly for the purpose of conducting a "recon[naissance] visit" (see Doc. 57-1, pp. 8-9: id., p. 1. ¶5, citing Jones's declaration). The notion that Mikhail Golubev was conducting a reconnaissance visit seems

-49-

implausible considering the uncontroverted evidence that he had no role in the selection of the GamingModz name or its marketing.

Even if Mikhail Golubev did visit the website, the plaintiff fails to show that merely viewing a website renders an individual a "moving, active, conscious force" in corporate decisions to engage in infringing acts. This is especially so here where the uncontradicted testimony shows that Mikhail Golubev had no role in the selection of the GamingModz name or marketing of the website.

The plaintiff argues, vaguely, that visiting the website shows Mikhail Golubev knew, or should have known, that GamingModz was violating GAMERMODZ's mark (Doc. 57-1, p. 9). This is mere supposition. In fact, Mikhail Golubev denies that he even knew, as of May 4, 2010, that GamingModz was operating a website business under the domain name gamingmodz.com (Doc. 60-1, ¶66). Moreover, the plaintiff presents no legal authority that an individual can be held personally liable for infringing conduct that he did not bring about, merely because he should have been aware of it.

In sum, there is no evidence that Mikhail Golubev was a "moving, active and conscious force" in the alleged wrongful conduct.

-50-

Therefore, Mikhail Golubev is entitled to summary judgment in his favor on

the plaintiff's claims against him in his individual capacity.

VI.

Finally, the defendants, in one sentence, seek summary judgment

on their six counterclaims (Doc. 35, p. 25). In their answer, the defendants

assert counterclaims for a declaratory judgment that "GAMINGMODZ and

RAPIDMODZ" (Doc. 21, pp. 26-28):

- do not infringe the GAMERMODZ mark in violation of federal or Florida trademark law;

- have not infringed any copyright owned by GAMERMODZ;

- have not committed unfair competition that damaged GAMERMODZ;

- have not interfered with the advantageous business relations of GAMERMODZ; and

- have not violated the FDUTPA.

Since genuine issues of material fact exist as to whether

defendant GamingModz infringed the plaintiff's mark, engaged in unfair

competition, and violated FDUTPA, the defendants are not entitled to a

declaratory judgment which states that GAMINGMODZ is entitled to

summary judgment on those claims. RapidModz is entitled to summary

-51-

judgment on those claims, but if it is contending that it is entitled to any additional relief, its conclusory request is patently inadequate. Further, the defendants neither set forth the elements, nor make an argument, showing that they are entitled to summary judgment with regard to claims of tortious interference with advantageous business relations and copyright infringement. Accordingly, summary judgment should also be denied as to those counterclaims.

## VII.

For these reasons, I recommend that the defendants' Motion to Strike (Doc. 63) be granted to the extent that the declarations of Coy A. Christmas and Jonah Matthew Coe, and exhibits C and D to the Declaration of Colin Jones, be stricken. Nevertheless, I recommend that the defendants' Motion for Summary Judgment (Doc. 35) be denied as to the plaintiff's claims against defendant GamingModz, as well as the defendants' request for summary judgment on their counterclaims.

However, I recommend that RapidModz be granted summary judgment on the plaintiff's claims against it. Similarly, I recommend that summary judgment be entered in favor of Mikhail Golubev regarding the plaintiff's claims of individual liability against him.

-52-

Respectfully submitted,

THOMAS  G.  WILSON
UNITED STATES MAGISTRATE JUDGE

DATED: AUGUST 3 , 2011

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal.  28 U.S.C. 636(b)(1).